van Gestel, Allan, J.
This matter is before the Court following two decisions on summary judgment and a trial on the merits of matters relating to damages and other relief. What follows are the findings of fact, rulings of law and an order for final judgment on damages and other relief.
FINDINGS OF FACT
Involved are three essentially identical joint venture agreements executed in 1980 and 1981. The agreements were formed for the principal purpose of acquiring, operating and developing properly located at 135-145 Ward Street (“Carlyle House”), 175 Ward Street (“Dartmouth House”), and 315 Charger Street (“Exeter House”), all in Revere, Massachusetts.
Although different at the beginning, for all purposes relevant to this case there are four joint venturers in each venture, as follows: the plaintiff, BPR Group Limited Partnership (“BPR”); and the defendants Richard K. Bendetson (“Bendetson”), Carson Revere, LLC (“Carson”) and CDE Revere, LLC (“CDE”).
At all times material, including the time of dissolution, each of the four current joint venturers had a 25% ownership interest in each of the three joint ventures.
For purposes of these findings of fact, significant language in each of the three joint venture agreements is identical. That language appears in Section 4 and Section 11, as follows:
4. Term. This Agreement shall commence as of the date hereof and shall continue and not be dissolved or terminated except as hereafter provided.
5[*
11. Termination.
A. This Joint Venture shall terminate upon the first to occur of the following events:
1. Upon notice of any non-defaulting Member, if any other Member shall fail to perform his or its obligations hereunder and such default shall continue uncured for a period of at least sixty (60) days after written notice thereof from the party claiming such default; the party desiring to terminate under this provision shall, after the expiration of the sixty (60) period, give one (1) month’s written notice of his intention to terminate.
2. Upon the conveyance of all of the real estate comprising the Property.
3. At the option of any Member not in default within a reasonable time after notice that any other Member shall have had filed by or against him pursuant to a statute of the United States or of any state, a petition in bankruptcy or insolvency or for the appointment of a receiver or trustee of all or a portion of such party’s assets and such other party fails within sixty (60) days to secure a discharge thereof, or if such other party shall make an assign *557 ment for the benefit of creditors or petition for or voluntarily enter into an arrangement for the benefit of creditors.
4. By mutual agreement of all of the Members.
There was a falling out between the individuals in control of BPR and Bendetson. The falling out, however, was personal and not related to any alleged failure by Bendetson to perform his obligations under any of the three joint venture agreements. Nevertheless, on December 22,2003, BPR served written notice on the remaining three members of each joint venture “that, pursuant to Massachusetts General Laws Chapter 108A, sec. 31(l)(b)” the particular joint venture “is hereby dissolved.”[2]
Bendetson, Carson and CDE, pointing to Section 11 of the respective joint venture agreements, and the fact that none of the four events of termination had occurred, declined to proceed with the asserted dissolution and consequent winding up of the joint ventures.
BPR’s complaint was filed on January 13, 2004. It sought declaratory relief to the effect that each of the three joint ventures was dissolved; requested the issuance of a decree of dissolution; sought an order that the defendants wind up the three joint ventures; and asked for an accounting from the defendants.
The matter then came before this Court on cross motions for summary judgment on all counts of the complaint. Among other things, this Court concluded, as follows [18 Mass. L. Rptr. 593):
It is true that none of the four occasions supporting dissolution in the agreements has occurred, and none may ever occur. But if this Court were then to rule that the agreements are, for that reason, “at will,” and thereby terminable by any partner at any time, then the provisions of Sections 4 and 11 in the joint venture agreements will be rendered superfluous. A Court must interpret a contract in such a way as to give effect to each of its provisions. McMahon v. Monarch Life Insurance Co., 345 Mass. 261, 264 (1962); S.D. Shaw & Sons, Inc. v. Joseph Rugo, Inc., 343 Mass. 635, 640 (1962). In order to do that here, the Court must read Sections 4 and 11 as providing sufficiently definite terms as to how the agreements are to be dissolved to make the agreements not at will.
In so doing, the Court does not intend to prevent BPR from seeking a decree of dissolution pursuant to G.L.c. 108A, secs. 32(1)(c), (d) or (f).
On January 3, 2005, the Court issued the following Order on those cross motions [18 Mass. L. Rptr. 593).
For the foregoing reasons, the defendants’ motion for summary judgment (Paper #8), is ALLOWED, but only with regard to Prayer a. of the complaint as related to Counts I, II and III, and otherwise is DENIED; and the motion of the plaintiff, BPR Group, for summary judgment is DENIED, without prejudice to refiling pursuant to G.L.c. 108A, secs. 32(l)(c), (d) or (f) if a sufficient record can be assembled.
The foregoing Order had the effect of approving Prayer a., which sought a declaration that each of the three joint ventures was dissolved.
On February 15, 2005, this Court responded to BPR’s motion for reconsideration and the defendants’ request for clarification with the following Order [19 Mass. L. Rptr. 177):
This Court has considered BPR’s motion for reconsideration and concludes that it should be DENIED.
Further, in response to the defendants’ motion for clarification, the Court will go no further than to say that as matters presently stand — because of the unchanged January 3, 2005 decision — the three joint ventures were dissolved by BPR pursuant to G.L.c. 108A, sec. 31(2) on December 22, 2003, in a manner that was in contravention to the joint venture agreements.
BPR having already dissolved the three joint ventures, this Court saw no need to order them dissolved again. To it, once was enough.
After some further discovery, the defendants filed a second motion, this time for partial summary judgment. On April 3, 2006, the Court issued the following Order on the second motion for partial summary judgment [20 Mass. L. Rptr. 684);
[T]he Defendants’ Motion for Partial Summary Judgment, Paper #26, is ALLOWED as follows: the Complaint for Declaratory Judgment, Dissolution and Windup, Paper #1, shall be dismissed; and on Count One of the Answer of the Defendants to the Complaint for Declaratory Judgment, Dissolution and Windup and Counterclaim, Paper #4, it is declared that the plaintiffs dissolution of each of the three joint ventures is wrongful and in contravention of the express and implied terms of the joint venture agreements and, on the remaining partners’ election, each of the joint ventures shall continue in business, provided that there is compliance with G.L.c. 108A, sec. 38(2)(b).
Pursuant to, and in compliance with, G.L.c. 108A, sec. 38(2)(b), Bendetson, Carson and CDE elected to continue the business of the three joint ventures. Consequently, the recently completed trial was for the purpose of determining the value of BPR’s interest in the three ventures at December 23, 2003, the first day after dissolution, less any damages caused to the continuing venturers by BPR’s dissolution. The further facts that follow come from the trial of that valuation process.
For all practical purposes, essentially all of the assets of the three ventures are the two parcels of real estate known as Carlyle House and Exeter House and the 14 condominium units at Dartmouth House, each multi-unit residential properties located in that part *558 of Revere near the Northgate Shopping Center on Route 60.
Carlyle House contains 146 apartment units, and Exeter House contains 91 apartment units. The ventures own the entire buildings and land on which these two buildings are situated.
Several years ago, Dartmouth House was converted to a condominium. Efforts to sell all of the condominium units were unsuccessful, and the venture still owns 14 of the units at Dartmouth House. These units are rented for residential purposes to third parties.
A primary issue in determining the value of BPR’s interest in the ventures at the time of dissolution is a determination of the highest and best use of each of the three properties at that time. For these purposes the real estate appraisal experts for BPR and the remaining three venturers agree with a definition of highest and best use of real estate provided by the Appraisers Institute. Under that definition, highest and best use has four elements: (1) what is physically possible; (2) what is legally permissible; (3) what is financially feasible; and (4) what achieves the maximum profitability.
BPR’s expert opined that the highest and best use for all three properties was to keep Dartmouth House as a condominium[3] and to convert Carlyle and Exeter Houses from rental apartments to condominiums as well.
Bendetson’s, Carson’s and CDE’s expert opined that all three properties should remain in their current status, with Dartmouth House remaining as a condominium and Carlyle and Exeter Houses remaining as rental apartments.
The first three prongs of the Appraisers Institute test are met by both appraisers’ opinions. The properties could be either condominiums or rental apartments physically, legally and financially. The issue on which the appraisers divide is what would achieve the maximum profitability.
The two experts differ principally on the costs to convert Carlyle and Exeter Houses to condominiums and the availability of a ready market for such condominiums in the locus of the properties. This Court concludes, and finds, that the factors supporting no change in the legal status of the three properties from that which existed on December 23,2003, best reflects the highest and best use of each property. Among the factors considered are:
1.The location of the properties. They are not in that part of Revere in which higher priced condominiums were being marketed readily on December 23, 2003. The marketable condominiums in Revere then, as now, are basically clustered along Revere Beach, with views of the ocean and ready access to the beach. Dartmouth, Carlyle and Exeter Houses are approximately three miles from Revere Beach, just off busy Route 60, near the Northgate Shopping Center. They were, and are, adjacent to a junk yard, a Revere DPW vehicle garage, and a U.S. Postal Service collection and distribution facility. Nearby was, and is, a gym in a large concrete building, and a self-storage facility. Also, in December 2003, an active quarrying operation was then in the vicinity.
Behind the buildings was, and is, a large, and unattractive, drainage culvert.
Public transportation was, and is, by bus. The Wonderland MBTA Station is much too far to get to on foot.
Revere High School is likewise too far to walk to, and no grammar or intermediate schools were shown to be nearby.
2. The physical size and construction of the buildings. The buildings are not new. They have been in the ownership of the parties to this case for 25-26 years, since 1980 and 1981. The units in Carlyle and Exeter Houses range in size from 600 to 650 square feet for single-bedroom units to 750 to 775 square feet for two-bedroom units. Closet space is limited and most facilities, such as kitchen appliances, bathroom fixtures, and cabinets are inexpensive and not new. The kitchen and bathroom flooring are vinyl tiles. The interior hallways are narrow and dark. The boilers are said to be original equipment; the roofs are at least 12 years old.
Of the combined 237 units in Carlyle and Exeter Houses, only 42 are two-bedroom units.
A substantial amount, of cosmetic work, both inside and out, would have been needed to make the units even marginally attractive to potential buyers.
The present rental units have a high occupancy rate, but an equally high turnover rate, suggesting that short-term residential occupancy is satisfactory but long-term residential ownership may not be.
3. The market range and economics. The experts seem to agree that a five-mile radius pretty well defines the general area from which potential buyers would have been attracted to these properties. In that radius, in Revere, East Boston, Chelsea and Malden, BPR’s expert reported that the average annual income was only $45,000.00. At the same time, that expert opines that the converted condominium units in Carlyle and Exeter Houses would have sold, within two years, at an average price of $ 167,500.00. This Court finds both the potential sales price and the two-year sell-off period to be extremely unlikely for these properties. Indeed, the experience of these venturers with nearby Dartmouth House’s conversion to condominium status years ago belies such optimism.
A number of the past, and present, tenants at Carlyle and Exeter Houses were low income and on government rental subsidies. These tenants were certainly not candidates to buy their units for $167,500.00, nor could they legally have been compelled to move out within two years of condominium conversion.
*559 4. The cost of condominium conversion. The two experts are widely apart on the costs to convert Carlyle and Exeter Houses to condominiums. BPR’s expert opines that the cost of conversion to condominiums would be in the range of $23,750.00 per unit. The remaining venturers’ expert projects a price of $59,763.00. The former figures came from “percentages” from another conversion of a property not shown to be comparable to Carlyle or Exeter Houses. The latter number had a more solid base of support.
The difference between the two experts’ views of the cost of conversion run from $5,628,750 on the low side to $14,163,831 on the high side. Even arbitrarily taking an average conversion price per unit of $41,756, halfway between that proposed by the two experts, provides a cost of conversion of $9,896,172.
Having determined the highest and best uses for the three properties to be their present use, the Court next considers their market values as of December 23, 2003. Again the experts vaiy, but here principally because they differ on what is the highest and best use.
This Court found the opinions of the remaining venturers’ expert to be soundly based and accepts them for the purpose of determining the market values of the three properties at the time of dissolution of the ventures. They produce adjusted net asset values of: $9,663,000 for Carlyle House; $4,850,000 for Exeter House; and $2,095,000 for the 14 condominium units at Dartmouth House. BPR’s interest in each property is 25%. Consequently, BPR’s un-discounted value of the partnership interests are as follows: $2,415,750 for Carlyle House; $1,215,750 for Exeter House; and $523,750 for Dartmouth House.
The process does not end here. The foregoing undiscounted values of BPR’s interests are not its interests in the ventures on December 23, 2003. The parties’ experts on the valuation of interests in businesses of the nature involved here agree on this point. Further, they both agree that BPR’s interests must be discounted because BPR held only a 25% interest in each property (a minority interest discount) and those interests are illiquid because they are not publicly traded and agreement by the remaining partners on the admission of a new partner is necessary (a marketability discount). Here, again, the experts diverge on how those two discounts should be measured.
A minority interest discount considers the fact that since BPR’s 25% interests cannot control the partnerships, they are worth less than if they were controlling blocks. Strangers to a venture are less likely to want to buy in when they would have little or no control of the venture.
A principal area of disagreement between the experts is over the appropriate discount for BPR’s minority interest. Confusion is injected into this analysis because of disagreement over whether these properties should be classified as having “low to no debt” or “moderate to high debt.” This is because a respected rating entity, Partnership Profiles, Inc. (“PPI”), has published some conflicting data as to what constitutes low to no debt and moderate to high debt. An appropriate minority interest discount for multi-family residential properties, suggests PPI, for low to no debt is 17.0%, and for moderate to high debt is 31.6%.
The confusion comes with PPI’s differing statements as to what should be the cut-off point between what is low and what is moderate debt. In one publication PPI says that the cut-off point is at a ratio wherein the debt exceeds 25%, and in another publication PPI sets the cut-off point at 50%.
Bendetson told this Court that the properties are veiy successful and their mortgages are extremely low. In fact, the remaining venturers’ real estate expert reported that the mortgage on Carlyle House was only $763,000 and Exeter House was $1,245,000; and there was no mortgage at all on any of the 14 Dartmouth House condominium units.
Given the adjusted net asset values found above for the properties, this Court finds all three properties to be in the low to no debt category. In making this finding, the Court is aware that the Exeter house debt ratio may come to just barely over 25%. Given PPI’s created confusion of suggesting that the cut-off point was possibly 25% or possibly 50%, this Court does not consider its finding to be out of line. Thus, the Court will apply a 17% minoriiy discount for each property. This produces the following values for BPR’s interests, adjusted for a 17% minority discount: $2,005,072.50 for Carlyle House; $1,009,072.50 for Exeter House; and $434,712.50 for the 14 Dartmouth House condominium units.
Next, the Court looks at the issue of marketability discounts for the three properties. Marketability discounts consider that ownership interests in partnerships like those in issue are not publicly traded and, therefore, require time to liquidate. Factors that come into play are transfer restrictions imposed by banks, the size of partnership distributions, liquidity prospects, the limited pool of potential buyers, risk factors, including competing properties, competing investments, the economy, the buildings’ ages, and limited growth prospects.
Both experts suggest a marketability discount of 20%, which this Court will accept. This produces the following values: $1,604,058.00 for Carlyle House; $807,258.00 for Exeter House; and $347,770.00 for the 14 condominium units at Dartmouth House.
The Court, therefore, concludes and finds that BPR’s aggregate interest in the three properties, as of December 23, 2003, was $2,759,098.00.
Next the Court must examine the question of whether BPR’s dissolution of the ventures caused any harm to the three venturers who have chosen to continue in business. The evidence addresses one issue, a possible defeasance fee, and the Court deferred the quantification of another, attorneys fees.
*560 In order to pay to BPR its interests in the ventures, as found by this Court, the remaining venturers may be required to refinance the mortgages on Carlyle and Exeter Houses. Those mortgages include defeasance payment provisions in order to obtain the release of the properties from the liens of the mortgages. What is called for, among other things, is “the payment to the Mortgagee of the Defeasance Deposit.” The Defeasance Deposit is defined in Paragraph 57(c)(i) of the Mortgage as follows:
The term “Defeasance Deposit” shall mean an amount equal to the remaining principal amount of the Note, the Yield Maintenance Premium, any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this Paragraph 57; . . .
There was no credible evidence of what amount the defeasance fee will be. Obviously, it depends upon a number of factors, some not yet known and that will not be known until, if at all, a defeasance comes into being. Consequently, while this Court would find that a defeasance fee of the kind in issue would be an appropriate element of damages assessable against BPR for dissolving the ventures, the amount of such a fee cannot be determined on the present record.
RULINGS OF LAW
The law controlling this case is found in Anastos v. Sable, 443 Mass. 146 (2004). There, like here, the SJC addressed “the proper valuation of a minority interest in a general partnership when the withdrawing partner caused a statutory dissolution in contravention of the partnership agreement and, rather than liquidate, the remaining partners elected under G.L.c. 108A, to continue the partnership’s business for the remaining term of the partnership agreement.” Id. at 146-47.
In approving the trial judge’s use of the going concern method of valuation in Anastos, Justice Spina, speaking for a unanimous court said:
The plaintiffs interpretation of the statute [sec. 38(2)(c)(II)] would result in the application of liquidation value analysis in all situations, regardless whether the partnership business is continued for the remainder of the partnership term. This interpretation renders distinct provisions of the statute superfluous, and we reject it. . . We conclude that “at the dissolution” was included in sec. 38(2) (b) as a reference point in time in the partnership’s history to be considered during valuation of the departing partner’s interest.
The judge’s use of the ongoing concern method of valuation is correct as a matter of law when the remaining partners choose to continue the business. Her use of a . . . minority shareholder discount is well supported by the evidence and therefore not clearly erroneous. We will not disturb her valuation ... for the plaintiffs partnership interest at the point of dissolution.
Id. at 152.
In Anastos, the court let stand as damages an award of attorneys and expert witness fees, but only because the parties had stipulated thereto. Id. at 152-53. There is no such stipulation here. Consequently, this Court chooses to follow Shulkin v. Shulkin, 301 Mass. 184, 191-92 (1938), on that issue, and, therefore, denies such fees as damages in this case. See Anastos, supra, 443 Mass. at 152-53.
Further, BPR is not entitled to any prejudgment interest on the amount awarded to it. See id. at 153-55.
ORDER FOR JUDGMENT
For the foregoing reasons, the Court orders judgment to enter as follows:
1. The defendants Richard K. Bendetson, Carson Revere, LLC and CDE Revere, LLC having exercised their rights to continue the business of the joint ventures in issue, shall pay to the plaintiff, BPR Group Limited Partnership (or in the alternative supply a bond, satisfactoiy to this Court) in the amount of $2,759,098.00.
2. The defendants shall deduct the amount of any actual defeasance fee paid and the actual net costs of refinancing should they refinance the properties in issue, within 90 days hereof, to pay this judgment.
3. The defendants shall deduct the amounts of any payments they have made to the plaintiff for matters occurring after December 23, 2003, to the date of this order, as distribution or other payments under the joint venture agreements in issue.
4. This Court shall retain jurisdiction of this matter to resolve any disputes that may arise concerning payments and credits contemplated by paragraphs 2 and 3 of this order.

Although the Court is here dealing with joint ventures, the parties, like the law itself, have treated them for the most part as if they were partnerships. “Speaking generally a joint adventure is a partnership of a sort or, at least, it has many of its characteristics. It differs, however, from a partnership in that it is ordinarily, although not necessarily, limited to a single enterprise, whereas a partnership is usually formed for the transaction of a general business." Cardullo v. Landau, 329 Mass. 5, 8 (1952).

Of course, the joint venturers at the time of dissolution only owned 14 of the condominium units at Dartmouth House. They were not shown to be, collectively or otherwise, owners of all of the units in the Dartmouth House condominium or even to be participants in the organization of unit owners. To say nothing of limitations in the master deed or the by-laws of the organization, at a minimum, they could not convert those 14 units back to apartments without the consent of the remaining unit owners and the execution of an amended master deed. See generally G.L.c. 183A, and particularly sec. 19(a) thereof.